# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ALEXANDER OTIS MATTHEWS, <br><br> *Plaintiff*, <br><br> v. <br><br> FEDERAL BUREAU OF INVESTIGATION, <br><br> *Defendant.* | Civil Action No. 15-569 (RDM) |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Alexander Otis Matthews, proceeding *pro se*, is currently serving a sentence for bank fraud and wire fraud.  In March 2013, Matthews submitted a Freedom of Information Act ("FOIA") request to the Federal Bureau of Investigation ("FBI"), seeking all records about himself.  Dkt. 53-5 at 2–3 (Hardy Decl. ¶ 5).  To date, the FBI has processed 671 pages of responsive documents but has declined to process any "investigative files resulting in [Matthews's] wire fraud and bank fraud prosecutions . . . and the related motion to vacate [his] sentence" because Matthews "waived his rights to request [those] investigative documents under the FOIA and Privacy Acts" in his plea agreement.  Dkt. 53-6 at 3, 10–11 (Argall Decl. ¶¶ 4, 20).

The matter is now before the Court on the FBI's motion for summary judgment.  Dkt. 53.  Matthews opposes the motion on one ground: He argues that he is entitled to records related to his prosecution because the FOIA waiver in his plea agreement is unenforceable as a matter of public policy.  Dkt. 59 at 3.  Matthews does not otherwise challenge any of the FBI's other withholdings.  Because the Court concludes that Matthews's FOIA waiver is unenforceable under the D.C. Circuit's decision in *Price v. U.S. Dep't of Justice Attorney Office*, 865 F.3d 676

(D.C. Cir. 2017), the Court will **DENY** the FBI's motion for summary judgment with respect to the FBI's waiver defense. Moreover, because the Court requires additional information to assess portions of the FBI's withholdings pursuant to FOIA Exemptions 6 and 7(D), the Court will also **DENY** the FBI's motion with respect to those withholdings. In all other respects, however, the Court will **GRANT** the motion.

## I. BACKGROUND

### A. Factual Background

#### 1. *Matthews's Prosecution*

In 2011, the United States charged Matthews in two indictments related to mortgage and investment fraud[1]: a one-count indictment filed in the Eastern District of Virginia for wire fraud and a one-count indictment filed in the District of Maryland for bank fraud. Dkt. 53-2 at 1 (Def. Statement of Undisputed Material Facts ("SUMF") ¶ 4); Dkt. 53-4 at 2 (Faulconer Decl. ¶¶ 2b–2c). Matthews agreed to transfer the Maryland indictment to the Eastern District of Virginia, where the two cases were litigated in tandem. Dkt. 53-4 at 2 (Faulconer Decl. ¶¶ 2e–2f). On July 15, 2011, Matthews pled guilty to both indictments. *See* Dkt. 24-1 at 57–58 (Plea Agreement ¶¶ 1a–1b). He admitted to three instances of mortgage fraud and one instance of investment fraud. Dkt. 53-2 at 1 (Def. SUMF ¶ 5); Dkt. 53-4 at 2 (Faulconer Decl. ¶ 2f).

Before Matthews pled guilty, the United States and Matthews's defense counsel in the Eastern District of Virginia cases entered into an "agreed" discovery order, which required the government to disclose information pursuant to Federal Rule of Criminal Procedure 16,

---

[1] This was not Matthews's first mortgage fraud prosecution. In 2001, he pled guilty in the U.S. District Court for the District of Columbia to one count of making a false statement, in violation of 18 U.S.C. § 1001, in connection with a mortgage fraud scheme. Dkt. 53-4 at 1–2 (Faulconer Decl. ¶ 2a). He was sentenced to four years of probation and ordered to pay $277,417 in restitution. *Id.*

exculpatory material required by *Brady v. Maryland*, 373 U.S. 83 (1963), *United States v. Agurs*, 427 U.S. 97 (1976), and witness material required by the Jencks Act and *Giglio v. United States*, 405 U.S. 150 (1972). Dkt. 53-2 at 2 (Def. SUMF ¶ 7); Dkt. 53-4 at 3 (Faulconer Decl. ¶ 3). Pursuant to that order, the United States produced "over 9,000 pages of documents on at least eight compact discs to [Matthews] and his counsel over approximately a three-month period of time." Dkt. 53-2 at 2 (Def. SUMF ¶ 8); *see also* Dkt. 53-4 at 3 (Faulconer Decl. ¶ 3). Those documents included "mortgage loans files, bank records, bankruptcy-related documents, reports and other documents related to interviews conducted by the [FBI], and materials related to [Matthews's] prior conviction in the District of Columbia." Dkt. 53-4 at 4 (Faulconer Decl. ¶ 3). After viewing the discovery, Matthews entered into a guilty plea and attested, as part of the plea agreement, that his attorney had rendered "effective service" in representing him. *See* Dkt. 24-1 at 58 (Plea Agreement ¶ 3).

The plea agreement also required Matthews to waive his right to file a FOIA request for documents relating to his prosecution. *See id.* at 62 (Plea Agreement ¶ 6). Specifically, the FOIA wavier states, in full:

> The defendant also hereby waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, Title 5, United States Code, Section 552; or the Privacy Act, Title 5, United States Code, Section 552a.

*Id.* In exchange for his various concessions and waivers, the United States agreed not to further prosecute Matthews for the conduct in either the Maryland or Eastern of District of Virginia indictments or for conduct set forth in the statement of facts. Dkt. 53-4 at 3 (Faulconer Decl. ¶ 2f). In October 2011, Matthews was sentenced to a 120-month term of incarceration and ordered to pay five million dollars in restitution. *Id.* (Faulconer Decl. ¶ 2g).

Matthews later filed a petition for collateral relief pursuant to 28 U.S.C. § 2255, alleging that his counsel had failed to "disclose the early plea offer" made by the Assistant U.S. Attorney ("AUSA") in the Maryland prosecution.  Dkt. 59 at 1.  In its brief in opposition, the U.S. Attorney's Office wrote:

> Here, the petitioner's claim is fatally flawed with respect to prejudice, and it is thus unnecessary to address whether [his counsel] rendered effective assistance.  More specifically, the petitioner has not even argued—let alone established—that the United States extended a particular formal plea offer to him.  As a result, the petitioner has failed to satisfy his burden of demonstrating that he, the United States, and this Court would have accepted such a hypothetical plea offer, and he is thus unable to satisfy the second prong of the *Strickland* test for his claims.

Dkt. 59-2 at 1.  The petition was denied, and Matthews is currently serving the remainder of his sentence at a halfway house in D.C.  *See* Dkt. 57.

    2.    *Matthews's FOIA Request*

On March 1, 2013, Matthews filed a FOIA request with the FBI, seeking records about himself.  Dkt. 53-5 at 2–3 (Hardy Decl. ¶¶ 5–6) (docketing Matthews's request as No. 1210788-000).  He alleges that his request was motivated by the fact that AUSA Ryan Faulconer, from the Eastern District of Virginia, had falsely represented during his § 2255 proceedings that no early plea offer was ever presented to his counsel.  Dkt. 59 at 1.  In response to Plaintiff's request, the FBI processed a total of 671 pages, releasing 35 pages in full, 272 pages in part, and withholding 364 pages in full, pursuant to Privacy Act Exemption (j)(2) and FOIA Exemptions 3, 5, 6, 7(C), 7(D), 7(E).  Dkt. 53-6 at 3–4 (Argall Decl. ¶ 4).[2]

_____

[2] The FBI made three releases to Matthews: one before he filed suit and two after.  On March 26, 2014, the FBI advised Matthews that it had processed 651 pages of responsive documents, and released 265 pages in full or in part.  Dkt. 53-5 at 4 (Hardy Decl. ¶ 12).  Next, by letter dated October 5, 2015, the FBI advised Matthews that it had reviewed the "197 file" records that he had sought in an amendment to his original FOIA request and was releasing 15 pages in full or in

**B. Procedural Background**

In April 2015, Matthews filed this lawsuit, alleging that the FBI refused to process some responsive documents and improperly withheld others. Dkt. 1 at 1 (Compl.). The FBI initially moved to dismiss the case on the ground that Matthews had neglected to pay his FOIA processing fees or to seek a fee waiver. Dkt. 12 at 1. The Court denied the motion as moot, *see* Minute Order (Oct. 8, 2015), after Matthews paid the processing fee in September 2015, *see* Dkt. 17. The Court then set a schedule for the production of non-exempt records and for dispositive motions briefing. Dkt. 21. In January 2016, the FBI moved for summary judgment. Dkt. 24. In its reply brief, the FBI argued for the first time that Matthews was prohibited from proceeding *in forma pauperis* pursuant to 28 U.S.C. § 1915(g). Dkt. 28 at 2. The Court, accordingly, dismissed Matthews's action without prejudice. Dkt. 31. In light of Matthews's motion for reconsideration, Dkt. 32, however, the Court concluded that Matthews was not barred from bringing his claim altogether, but that he was required to pay the filing fee in order to proceed. Dkt. 35 at 1. The Court received Matthews's filing fee in February 2018, *see* Receipt of Filing Fee (Feb. 21, 2018), and, subsequently, the FBI renewed its motion for summary judgment, Dkt. 53. That motion is now fully briefed.

## II. LEGAL STANDARD

The Freedom of Information Act mandates that an agency disclose records on request, unless they fall within one of nine exemptions. "These exemptions are explicitly made exclusive and must be narrowly construed." *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011) (citation

---

part. Dkt. 53-6 at 5 (Argall Decl. ¶ 8). Finally, by letter dated October 30, 2015, the FBI made a supplemental release of all responsive records—that is, "a complete collection of records that had been previously released to Plaintiff on March 26, 2014 and on October 5, 2015," along with a *Vaughn* Index. *Id.* (Argall Decl. ¶ 9).

and quotation marks omitted). "FOIA cases are typically resolved on motions for summary judgment under Federal Rule of Civil Procedure 56." *Shapiro v. U.S. Dep't of Justice*, 153 F. Supp. 3d 253, 268 (D.D.C. 2016). To prevail on a summary judgment motion, the moving party must demonstrate that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In a FOIA action, the Court may award summary judgment to an agency solely on the basis of information provided in affidavits or declarations that describe '. . . the justifications for nondisclosure [of records] with reasonably specific detail . . . and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Thomas v. FCC*, 534 F. Supp. 2d 144, 145 (D.D.C. 2008) (alteration in original) (quoting *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)). The Court reviews the agency's determinations *de novo*, and the agency bears the burden of sustaining its actions. 5 U.S.C. § 552(a)(4)(B).

## III. ANALYSIS

Aside from contesting the enforceability of the FOIA wavier in his plea agreement, Matthews does not otherwise challenge the adequacy of the FBI's search or its invocation of FOIA exemptions. The relevant portion of his four-page brief in opposition states, in full:

> The plaintiff very respectfully argues that the legal issues before the [C]ourt in this [FOIA] proceeding are compelling enough and are of serious enough a nature for the public that the [C]ourt has a duty to deny the defendant's motion for summary judgment and allow this case to go forward so that the records of the early draft plea agreement can be obtained as well as any other records that the plaintiff has requested in this proceeding.

Dkt. 59 at 3. Despite Matthews's non-opposition to the FBI's claimed exemptions, the Court will "verify the validity of each." *Summers v. U.S. Dep't of Justice*, 140 F.3d 1077, 1080 (D.C. Cir. 1998); *see also Fed. Open Market Comm. of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 351–52 (1979) (the agency invoking a FOIA exemption bears the burden of "establish[ing] that

the requested information is exempt").  The Court will, accordingly, briefly address the adequacy

of the FBI's search, each of the FBI's claimed exemptions, and whether the agency has released

all segregable, non-exempt records, before turning to the validity of Matthews's FOIA waiver.

## A.     Search and Withholdings

### 1.     *Adequacy of Search*

The FBI argues that it "conducted an adequate search for records in response to

[Matthews's] FOIA request."  Dkt. 53-1 at 9.  An agency "fulfills its obligations under FOIA if it

can demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all

relevant documents.'"  *Valencia-Lucena v. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999)

(quoting *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990)).  The adequacy of the

FBI's search is "judged by a standard of reasonableness and depends . . . upon the facts of each

case."  *Weisberg v. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984).  Importantly, "the

issue to be resolved is not whether there might exist any other documents possibly responsive" to

Matthews's request, but "whether the *search* for those documents was *adequate*."  *Id.* (emphasis

in original).  Absent contrary evidence, the FBI's affidavits or declarations will "suffice to

demonstrate compliance with . . . FOIA," *Perry v. Block*, 684 F.2d 121, 127 (D.C. Cir. 1982),

unless the record "leaves substantial doubt as to the sufficiency of the search," *Truitt*, 897 F.2d at

542.

To demonstrate the adequacy of its search, the FBI offers the declaration of Dennis

Argall, Assistant Section Chief of the Record/Information Dissemination Section ("RIDS") of

the FBI.  Dkt. 53-6 at 2 (Argall Decl. ¶ 1).  Argall explains that, "[i]n response to [Matthews's]

request, RIDS conducted a [Central Records System ("CRS")] index search for responsive

records."  *Id.* at 9 (Argall Decl. ¶ 18).  CRS is "an extensive system of records consisting of

applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI . . . ." *Id.* at 5 (Argall Decl. ¶ 10). According to Argall, "a [Universal Index ("UNI")] search in [the FBI's Automated Case Support ("ACS") system]"—as was conducted here —"is capable of locating" all CRS records "in both paper and electronic format." *Id.* at 8 (Argall Decl. ¶ 15). Argall described the FBI's search as follows:

> The ACS search was a three-way phonetic search of Matthews'[s] name. This means that first, the computer automatically broke his name down and searched the index for three different breakdowns of the name entered: "Matthews, Alexander Otis;" "Matthews, Alexander O.;" and "Matthews, Alexander." Then, the computer breaks names down based on their phonetic characteristics. The computer will return results based on whether they phonetically match a certain percentage of the first and last name searched. The default phonetic match setting for first and last names is 80%. Thus, in this case, the computer returned results that were an 80% or greater phonetic match to the three-way breakdowns of the names that were searched.

*Id.* at 9–10 (Argall Decl. ¶ 18). The following responsive files were located: 29B-WF-211936 and 197C-HQ-A2660193. *Id.* The search also located "several other files" that fell within the scope of Matthews's FOIA waiver in his plea agreement. *Id.*

Matthews, for his part, has offered no evidence to challenge the adequacy of the FBI's search, nor does he contest the search terms the FBI used or the scope of its search. Given that Matthews requested records about himself, the Court concludes that the FBI's search of its CRS, using three variations of Matthews's name, is reasonably calibrated to locate all responsive records. The Court will, accordingly, grant summary judgment in favor of the FBI on the adequacy of its search.

      2.    *Withholdings*

Next, the Court turns to the FBI's asserted rationales for invoking Exemptions 3, 5, 6, 7(C), 7(D), and 7(E) to withhold various responsive documents in whole or in part. The FBI has provided a *Vaughn* Index summarizing its withholdings. Dkt. 24-2. It also relies on Argall's

declaration. Matthews, for his part, does not contest the applicability of any of these exemptions, except to the extent that he argues the FBI is "obligated" to release all documents he is requesting. *See* Dkt. 59 at 3.

        a.    Exemption 3

Argall attests that the FBI invoked Exemption 3 of FOIA to withhold documents containing "information which explicitly discloses matters occurring before a Federal Grand Jury." Dkt. 53-6 at 16 (Argall Decl. ¶ 29). Exemption 3 "excludes from compelled disclosure matters that are 'specifically exempted from disclosure by statute.'" *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 245 F. Supp. 3d 19, 34 (D.D.C. 2017) (quoting 5 U.S.C. § 552(b)(3)). The exemption applies only when the statute at issue "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue," or "establishes particular criteria for withholding or refers to particular types of matters to be withheld." *Morley v. CIA*, 508 F.3d 1108, 1126 (D.C. Cir. 2007).

The FBI relied on Exemption 3 to withhold the "names and/or identifying information of third parties who were either subpoenaed . . . or actually provided testimony to the Federal Grand Jury; the company names and/or employees served with Federal Grand Jury subpoenas; information identifying specific records subpoenaed by the Federal Grand Jury; and other information on the internal workings of the Federal Grand Jury." Dkt. 53-6 at 16 (Argall Decl. ¶ 29). The FBI contends that this information is covered by Exemption 3 because Federal Rule of Criminal Procedure 6(e) expressly bars disclosure of "matters occurring before the grand jury," subject to certain exceptions, none of which are applicable here. *See* Dkt. 53-1 at 11–12 (citing Fed. R. Crim. P. 6(e)(3)). It is well-established that Rule 6(e) is a qualifying statute for purposes of Exemption 3. *See, e.g.*, *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1113 (D.C.

Cir. 2007); *Fund for Const. Gov't v. Nat'l Archives & Records Serv.*, 656 F.2d 856, 867 (D.C. Cir. 1981). Here, the identities of those served with Federal Grand Jury subpoenas, the records subpoenaed, and "other information on the internal workings of the Federal Grand Jury," Dkt. 53-6 at 16 (Argall Decl. ¶ 29), clearly disclose "matters occurring before the grand jury," Fed. R. Crim. P. 6(e). Accordingly, the Court concludes that the FBI properly invoked Exemption 3.

> b. Exemption 5

The FBI also invoked Exemption 5 to withhold documents that it claims are subject to various civil discovery privileges. Dkt. 53-6 at 17 (Argall Decl. ¶¶ 30–31). Exemption 5 covers "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Accordingly, the exemption extends to any document covered by the agency's civil discovery privileges, such as attorney-client privilege, attorney work-product privilege, and deliberative process privilege. *See FTC v. Grolier, Inc.*, 462 U.S. 19, 26 (1983); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 862 (D.C. Cir. 1980).

The FBI claims that two documents are protected by the deliberative process privilege: (1) a "draft application" prepared by the U.S. Attorney's Office "for an ex parte order to disclose information pertaining to the investigation" of Matthews's mortgage fraud, and (2) "a draft plea agreement prepared by the United States Attorney's Office," which was "supplied to the FBI for deliberation and input." Dkt. 53-6 at 19–20 (Argall Decl. ¶¶ 35–36). The deliberative process privilege only applies to documents that are predicisional (that is, generated before the adoption of an agency policy or action) and deliberative (that is, reflecting the give-and-take of the consultative process). *Coastal States Gas Corp.*, 617 F.2d at 866. Both requirements are satisfied here.

With respect to the first document—the draft ex parte application—Argall attests that the document is "clearly pre[]decisional" because it "shows evidence of being a draft—it has handwritten changes, strike-throughs, and notations, is not signed, and is not marked as 'filed' or 'received.'" Dkt. 53-6 at 19 (Argall Decl. ¶ 35). Moreover, Argall concludes that the draft ex parte application is "deliberative" because it "[1] expresses opinion on a legal matter, namely the formulating and potential filing of said application, [2] reflects the consultative process of the same, and [3] bore on the exercise of the agencies' judgment on how or whether to file for the said application." *Id.* Argall came to the same conclusions with respect to the draft plea agreement. He reasoned that the document was "clearly predecisional" because it was unsigned, labeled "*DRAFT*," and "ha[d] handwritten changes and notations." *Id.* at 20 (Argall Decl. ¶ 36). Argall further attests that the document is "deliberative" because it "[1] expresses opinion on a legal matter"—"namely[,] which facts are provable, the degree to which they are legally provable, and the overall strength of the government's case against this potential defendant," and "[2] reflects the consultative process between the FBI and the Office of the United States Attorney." *Id.*

In light of the above, the FBI reasonably concluded that the two documents "were prepared in the context of agency employees' and inter-agency deliberations;" that "they consist of preliminary opinions, evaluations and comments of FBI staff and U.S. Attorney staff;" and that the "release of these exempted materials would chill the full and frank discussion between agency personnel and/or other agency personnel regarding agency decisions." *Id.* (Argall Decl. ¶ 37). The Court, accordingly, holds that the FBI lawfully withheld the draft ex parte application and draft plea agreement pursuant to the deliberative process privilege.

The FBI also withheld three documents on the ground that they were attorney work product: the aforementioned draft ex parte application and "two other pages . . . [that] describe the FBI's actions after receiving [Matthews's] administrative tort claim." *Id.* at 21 (Argall Decl. ¶¶ 39–40). Because the Court has already concluded that the draft ex parte application was properly withheld pursuant to the deliberative process privilege, it will only address the second group of documents. According to Argall, "both [of these] documents are administrative pages showing the FBI attorneys' behind-the-scenes work and analytical process, in reasonable anticipation of litigation over [Matthews's] tort claims." *Id.* That is sufficient. *See Judicial Watch, Inc. v. U.S. Dep't of Justice*, 432 F.3d 366, 371 (D.C. Cir. 2005) ("[A]ny part of [a document] prepared in anticipation of litigation . . . is protected by the work product doctrine and falls under exemption 5." (second alteration in original) (citation omitted)).

Finally, the FBI withheld an "inter-agency letter from DOJ attorneys to FBI attorneys" based on attorney-client privilege. Dkt. 53-6 at 22 (Argall Decl. ¶ 42). That privilege protects "confidential communications from clients to their attorneys made for the purpose of securing legal advice or services;" "[i]n the governmental context, the 'client' may be the agency and the attorney may be an agency lawyer." *Tax Analysts v. IRS*, 117 F.3d 607, 618 (D.C. Cir. 1997); *see also Hunton & Williams LLP v. EPA*, 346 F. Supp. 3d 61, 80 (D.D.C. 2018) (quoting same). Here, Argall describes the letter as follows:

> In the letter, the DOJ attorneys provide legal advice to the FBI attorneys regarding the [FTCA] claim [Matthews] filed and the actions needed, and the DOJ attorneys also request legal advice from the FBI regarding the factual background, the application of law, and the FBI's opinion on the legal questions. To describe the communication in greater detail would risk disclosing the very information that is sought to be protected.

Dkt. 53-6 at 22 (Argall Decl. ¶ 42). Regardless which agency is viewed as counsel and which is viewed as the client, Argall testifies that the letter "is a confidential communication . . . seeking

legal advice and providing legal analysis." *Id.* That is sufficient to demonstrate that the FBI properly invoked attorney-client privilege.

        c.      <u>Exemptions 6 & 7(C)</u>

The FBI also explains that it withheld records pursuant to FOIA Exemptions 6 and 7(C). Exemption 6 shields "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). "[T]he mere fact that an agency file or record contains personal, identifying information," however, "is not enough to invoke Exemption 6;" the information must be "of such a nature that its disclosure would constitute a clearly unwarranted privacy invasion." *Judicial Watch, Inc. v. U.S. Dep't of State*, 282 F. Supp. 3d 36, 49–50 (D.D.C. 2017) (quoting *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002)). The Court must first determine whether "disclosure would compromise a substantial, as opposed to a *de minimis*, privacy interest." *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 874 (D.C. Cir. 1989), before "balanc[ing] the privacy interest in non-disclosure against the public interest" in disclosure. *Consumers' Checkbook Ctr. for the Study of Servs. v. U.S. Dep't of Health & Human Servs.*, 554 F.3d 1046, 1050 (D.C. Cir. 2009).

Exemption 7(C) protects similar interests to Exemption 6 but applies to a narrower category of records—those "compiled for law enforcement purposes. *See Tracy v. U.S. Dep't of Justice*, 191 F. Supp. 3d 83, 95 (D.D.C. 2016) (quoting 5 U.S.C. § 552(b)(7)(C)). The two exemptions, moreover, differ in other respects. Notably, while Exemption 6 is available only if the disclosure "would constitute a *clearly* unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6) (emphasis added), "[t]he adverb 'clearly' . . . is not used in Exemption 7(C)," *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 165–66 (2004). Similarly, while

"Exemption 6 refers to disclosures that '*would* constitute' an invasion of privacy, Exemption 7(C) encompasses any disclosure that '*could* reasonably be expected to constitute' such an invasion." *Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 756 (1989) (emphasis added).

Relying on these two exemptions, the FBI withheld "the names and identifying information" of six categories of individuals: (1) "FBI Special Agents . . . and support personnel who were responsible for conducting, supervising, and/or maintaining the investigative activities reflected in the documents responsive to Plaintiff's FOIA request," Dkt. 53-6 at 25 (Argall Decl. ¶ 48); (2) "personnel from non-FBI federal government agencies who provided information or otherwise assisted the FBI in its investigation of [Matthews] or others," such as AUSAs and employees of the Department of Housing and Urban Development., *id.* at 26–27 (Argall Decl. ¶ 50); (3) "individuals who were interviewed and/or provided information to the FBI during the course of its investigation," *id.* at 27 (Argall Decl. ¶ 51); (4) "third parties who were of investigative interest to the FBI," *id.* at 29 (Argall Decl. ¶ 53); (5) "third parties who were merely mentioned in the criminal investigative files containing information responsive to [Matthews's] request," *id.* at 30 (Argall Decl. ¶ 54); and (6) "person(s) who provided 'victim impact' or 'victim loss' information at the request of the court," *id.* at 31 (Argall Decl. ¶ 55). Based on the information provided in Argall's declaration, the Court concludes that the FBI properly withheld the names and identifying information of the six categories of individuals mentioned in Matthews's main investigative file. The Court needs further information, however, before it can grant summary judgment as to the FBI's withholdings in Matthews's 197 file.

As a threshold matter, the Court agrees that "[Matthews's] investigative main file" was compiled for a specific law enforcement purpose: "the FBI's criminal investigation" of

Matthews's 2001 and 2011 prosecutions for mortgage fraud.  Dkt. 53-6 at 23 (Argall Decl. ¶¶ 43–44 & n.19).  Accordingly, Exemption 7(C) applies to those records.  The D.C. Circuit has long adopted "a categorical rule permitting an agency to withhold information identifying private citizens mentioned in law enforcement records, unless disclosure is 'necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity.'"  *Schrecker v. U.S. Dep't of Justice*, 349 F.3d 657, 661 (D.C. Cir. 2003) (quoting *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1206 (D.C. Cir. 1991)).  "This protection has generally been afforded to the names of agency employees, as well, for similar if not identical reasons." *Tracy*, 191 F. Supp. 3d at 95 (citations omitted); *see also Lesar v. U.S. Dep't of Justice*, 636 F.2d 472, 488 (D.C. Cir. 1980) (concluding that Exemption 7(C) protects the names of FBI agents because the agents could face "public exposure or possible harassment").   Because Matthew makes no allegation that disclosure of the private individuals' information is necessary, and because Argall attests that the FBI personnel and other agency staff could face retaliation and adverse publicity, *see* Dkt. 53-6 at 25, 26–27 (Argall Decl. ¶¶ 48, 50), the Court concludes that the agency properly invoked Exemption 7(C) to withhold the names and identifying information of all individuals mentioned in Argall's declaration to the extent those documents were found in Matthews's main investigative file.

The responsive records, however, also include Matthews's "197 file," which is not an "investigative file," and was, in fact, "created as a result of [Matthews's claim against the FBI] under the Federal Tort Claims Act."  Dkt. 53-6 at 23 (Argall Decl. ¶ 44 & n.19).  The FBI argues that the 197 file still comprises law enforcement records for purposes of Exemption 7 because "it was compiled by a law enforcement agency in preparation of defending its law enforcement actions, and it contains discussion of law enforcement actions."  *Id.*  The Court is unpersuaded.

The D.C. Circuit has held that "records kept by a law enforcement agency must meet two criteria in order to qualify as law enforcement records":

> First, the agency's investigatory activities that give rise to the documents sought must be related to the enforcement of federal laws or to the maintenance of national security. An agency does not satisfy this requirement when merely engaging in a general monitoring of private individuals' activities; rather, the agency must demonstrate a connection between its investigation and the existence of a possible security risk or violation of federal law.
>
> Second, the nexus between the investigation and one of the agency's law enforcement duties must be based on information sufficient to support at least a colorable claim of its rationality.

*Doe v. FBI*, 936 F.2d 1346, 1353 (D.C. Cir. 1991) (internal quotation marks and citations omitted). By Argall's own admission, the 197 file does not contain "investigative files;" accordingly Exemption 6 applies to these records.

The FBI, accordingly, bears the burden of showing that the personal information in the 197 file was properly withheld under Exemption 6. To do so, it must establish that the information is "of such a nature that its disclosure would constitute a *clearly unwarranted* privacy invasion." *Judicial Watch, Inc.*, 282 F. Supp. 3d at 49–50 (emphasis added) (internal quotations and citations omitted). Although the Argall declaration spells out the harms each category of individuals could suffer if their identities were disclosed,[3] it does not offer any details about which categories of individuals appeared in the 197 file, or the types of records

---

[3] *See* Dkt. 53-6 at 25 (Argall Decl. ¶ 48) (FBI personnel could face "hostility" and retaliation); *id.* at 26–27 (Argall Decl. ¶ 50) (government personnel could face "adverse" publicity); *id.* at 27–28 (Argall Decl. ¶ 51) (third-party individuals who provided information to the FBI could be "harassed, intimidated, or threatened"); *id.* at 29 (Argall Decl. ¶ 53) (third parties of investigative interest could face "harassment or embarrassment"); *id.* at 30 (Argall Decl. ¶ 54) (third parties merely mentioned in documents would be subject to "possible harassment or criticism" based on their "being connected to a criminal investigation"); *id.* at 31 (Argall Decl. ¶ 55) (the two individuals who provided "victim impact" testimony could be subject to "reprisal, harassment, or threats").

from which the names and identifying information were redacted. Absent this basic information, the Court cannot ascertain whether the release of these names and identifying information would compromise a "substantial" privacy interest. *Nat'l Ass'n of Retired Fed. Emps.*, 879 F.2d at 874. The Court will, accordingly, deny summary judgment as to the FBI's withholdings based on Exemption 6 in the 197 file, but will provide the agency with an opportunity to make a more particularized showing.

        d.      <u>Exemption 7(D)</u>

Next, the FBI invoked Exemption 7(D), which permits the withholding of documents "compiled by criminal law enforcement authorities in the course of criminal investigations" that "could reasonably be expected to disclose the identity of, as well as information provided by, a confidential source." *Cooper v. Dep't of Justice*, 169 F. Supp. 3d 20, 39 (D.D.C. 2016) (internal quotation marks and citations omitted). Because Exemption 7(D) applies not only to the identity of the informant, but also to the "information furnished," it sweeps more broadly than Exemption 7(C). *See Lamb v. Millennium Challenge Corp.*, 334 F. Supp. 3d 204, 217 (D.D.C. 2018). Whether the FBI can claim Exemption 7(D) "depends upon whether the particular source who furnished the information at issue was granted confidentiality, either expressly or by implication." *Cooper*, 169 F. Supp. 3d at 39 (citing *Mays v. Drug Enf't Admin.*, 234 F.3d 1324, 1328 (D.C. Cir. 2000)). Not every source who "provides information to the FBI in the course of a criminal investigation" is a "confidential source;" the FBI may only claim this exemption if it expressly granted the informant confidentiality or if it can adequately "point to more narrowly defined circumstances that will support the inference [of an implied assurance]." *Mays*, 234 F.3d at 1329 (internal quotations and citation omitted). "[W]hen circumstances such as the nature of the crime investigated and [the informant's] relation to it support an inference of confidentiality,

the [FBI] is entitled to a presumption [of implied confidentiality]." *Id.* (second alteration in original). More specifically, courts in this Circuit look to factors such as:

> the character of the crime at issue, the source's relation to the crime, whether the source received payment, and whether the source has an ongoing relationship with the law enforcement agency and typically communicates with the agency only at locations and under conditions which assure the contact will not be noticed.

*Roth v. Dep't of Justice*, 642 F.3d 1161, 1184 (D.C. Cir. 2011) (internal quotations and citations omitted).

The FBI identifies two categories of documents that it withheld containing "names, identifying information about, and information provided by third parties" under implied assurances of confidentiality. Dkt. 53-6 at 33 (Argall Decl. ¶ 59). *First*, the FBI withheld documents concerning "information about" and information "provided by" an individual who "was in a position to have ready access to, and knowledge about, targets and others involved in fraudulent activities." *Id.* at 33–34 (Argall Decl. ¶ 59(a)). This individual "agreed to provide an informal proffer of some interviews he/she had conducted" and "provided specific detailed information . . . concerning the activities of certain subjects regarding the FBI's investigation of fraudulent activities." *Id.* Argall attests that disclosure of this source's identity "could subject [him/her], as well as his/her family, to embarrassment, humiliation, and/or physical or mental harm." *Id.* at 34 (Argall Decl. ¶ 59(a)). *Second*, the FBI withheld documents containing the identifying information about "seven other individuals who provided . . . non-public information to the FBI regarding the criminal activities in the responsive records" who were also "in positions to have unique access to and/or knowledge about the targets of the investigation." *Id.* (Argall Decl. ¶ 59(b)). "[I]n some instances, [this] information was provided pursuant to a Federal Grand Jury subpoena." *Id.* Argall attests that these individuals also operated under an

implied understanding of confidentiality "[d]ue to the singular nature of the information and the insights provided, and the particular relationships with the targets."[4] *Id.* His declaration explains that, in general, "third parties cooperate[] with the FBI only with [an] expectation of confidentiality" because they "do so at a great risk of retaliation" and have, in fact, faced such retaliation "when their assistance to the FBI has been publicly disclosed." *Id.* at 35 (Argall Decl. ¶ 60).

Applying the factors from *Roth*, 642 F.3d at 1184, the Court concludes that Argall's declaration "support[s] the inference of confidentiality," *Cooper*, 169 F. Supp. 3d at 39, with respect to the informant who agreed to provide an informal proffer. The crimes at issue included bank fraud and wire fraud (based on Matthews's mortgage and investment fraud schemes), which resulted in his sentence of 120-months' incarceration and five-million dollars in restitution. *See* Dkt. 53-2 at 1 (Def. SUMF ¶¶ 4–5); Dkt. 53-4 at 3 (Faulconer Decl. ¶ 2g). "The seriousness of the offense and the resulting punishment weigh in favor of finding cooperator confidentiality." *Marck v. Dep't of Health and Human Servs.*, 314 F. Supp. 3d 314, 328 (D.D.C. 2018) (analogous case involving "conspiracy to defraud the United States; bank fraud, fraud by wire, radio, or television; and securities violations" resulting in a sentence of 180 months' incarceration). Although the source did not have an on-going relationship with the FBI and was not, as far as the Court is aware, paid by the FBI, Argall attests that he or she had a close relationship with the target(s). In fact, Argall attests that the source had "agreed to provide an informal proffer of some interviews he/she had conducted." Dkt. 53-6 at 34 (Argall Decl.

---

[4] Although this statement is cursory on its face, Argall explains that brevity is necessary because "describing the individuals or information in further detail would risk revealing the very information the FBI endeavors to protect." Dkt. 53-6 at 34 (Argall Decl. ¶ 59(b)).

¶ 59(a)).  In light of these facts, the Court concludes that the FBI properly invoked Exemption 7(D) with respect to this source.

On the present record, however, the Court cannot conclude that the FBI's invocation of Exemption 7(D) was proper with respect to the other seven informants.  The FBI merely recites, in boilerplate fashion, that these individuals were "in positions to have unique access to and/or knowledge about the targets of the investigation."  *Id.* at 34 (Argall Decl. ¶ 59(b)).  Argall also attests that "[o]ne of these individuals provided information pursuant to a proffer agreement," and that, "in some instances," information from these informants "was provided pursuant to a Federal Grand Jury subpoena."  *Id.*  That is not enough to show that each of these seven sources operated under an implied understanding of confidentiality absent evidence that all of the sources were similarly situated.  Although the Court is sensitive to the FBI's concern about ensuring these individuals' safety, the agency must provide *some* particularized justification with respect to *each* source.  *Cf. U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 180 (1993) ("We think [a] more particularized approach is consistent with Congress' intent to provide 'workable rules' of FOIA disclosure." (citations omitted)); *Hale v. Dep't of Justice*, 99 F.3d 1025, 1030 (10th Cir. 1996) ("When relying on an inference of confidentiality, the government's *Vaughn* index and affidavits, as well as the district court's findings, should provide sufficient detail on a source-by-source basis to support an assertion of implied confidentiality." (citations omitted)).  The Court will, accordingly, deny summary judgment as to the FBI's withholdings on the basis of implied confidentiality for the seven informants, but will provide the agency with an opportunity to make a more particularized showing.

The FBI also withheld "the confidential source file numbers of two cooperating witnesses" that "were not connected to this investigation but were . . . listed in the file on an

administrative page." Dkt. 53-6 at 35 (Argall Decl. ¶ 61). The FBI uses confidential source file numbers as an "administrative tool[] to assist in retrieving information supplied by a source." Dkt. 53-1 at 25. The agency contends that repeated "[d]isclosure of . . . confidential source file numbers . . . could ultimately identify the sources because it would reveal the connections of cooperating witnesses to the information they provided" and would ultimately "have a chilling effect on the activities and cooperation of other confidential informants and cooperating witnesses." *Id.* at 36 (Argall Decl. ¶¶ 62, 63). The FBI further notes that "individuals can be persuaded to continue their assistance in providing information to the FBI in the future" only if they possess an "understanding [and assurance] of complete confidentiality." *Id.* (Argall Decl. ¶ 63). Other courts in this Circuit have upheld the invocation of Exemption 7(D) to protect confidential source file numbers. *See, e.g.*, *Williams v. FBI*, 69 F.3d 1155, 1158, 1160 (D.C. Cir. 1995) (upholding the district court's grant of summary judgment in favor of the FBI for withholding "source symbols" and "file numbers" related to confidential informants); *Stein v. U.S. Dep't of Justice*, 134 F. Supp. 3d 457, 487 (D.D.C. 2015) (upholding withholding of confidential source number). The Court, accordingly, concludes that the FBI properly redacted the confidential sources numbers of the two cooperating witnesses.

      e.      <u>Exemption 7(E)</u>

      Finally, the FBI invoked Exemption 7(E), which "permits withholding of law enforcement records 'to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations.'" *Blackwell v. FBI*, 646 F.3d 37, 41 (D.C. Cir. 2011) (quoting 5 U.S.C. § 552(b)(7)(E)). The exemption poses a "relatively low bar": The FBI need only "demonstrate logically how the release of the requested information might create a risk of circumvention of the law." *Dillon v.*

*Dep't of Justice*, 102 F. Supp. 3d 272, 296–97 (D.D.C. 2015) (quoting *Blackwell*, 646 F.3d at

42); *see also Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009) ("[T]he exemption

does not force the [agency] to show . . . reasonably expected risk with certainty—only that

disclosure *could* reasonably be expected to create such a risk." (emphasis in original)).

The FBI withheld five categories of documents pursuant to Exemption 7(E). *First*, the

agency withheld information regarding its techniques for "questioning and [gathering]

evidence." Dkt. 53-6 at 37–38 (Argall Decl. ¶ 66). According to Argall, the disclosure of this

information would "give criminals unwarranted insight" into the "'routine' plays" used by the

FBI during questioning and "tip off adversaries as to how and when those plays are used." *Id.*

*Second*, the agency withheld information from a "non-public database used for official law

enforcement purposes" that "serves as a repository for counterterrorism and investigative data."

*Id.* at 38–39 (Argall Decl. ¶ 67). Release of this information "could enable criminals to employ

countermeasures to avoid detection." *Id. Third*, the FBI refused to disclose FBI Form FD-516,

which "is used by FBI [Special Agents] to report investigative accomplishments." *Id.* at 39–40

(Argall Decl. ¶ 68). Argall concludes that disclosure of this form would allow "[Matthews] and

others involved in similar criminal violations [to] change their activities . . . to circumvent and

avoid detection and/or surveillance in the future. *Id. Fourth*, the FBI withheld "a sensitive case

file number and other . . . information" related to the FBI's file numbering conventions, the

release of which could "identif[y] the investigative interest or priority given" to internal

investigations. *Id.* at 40–41 (Argall Decl. ¶ 69). According to Argall, disclosure of this

information could allow suspects to apply a "mosaic analysis" and "use these numbers . . . to

change their pattern of activity to avoid detection, apprehension or create alibis for suspected

activities." *Id. Fifth*, and finally, the FBI refused to disclose "the purpose, methods, focus of

questioning, and results of a polygraph examination." *Id.* at 41 (Argall Decl. ¶ 70). Argall

attests that this information is "not generally known to the public," and its disclosure "would

enable criminals . . . [to] take countermeasures to defeat the effectiveness of the polygraph and

impede future investigations." *Id.*

In light of Argall's detailed declaration, and Matthews's failure to dispute any of the

factual assertions on which Argall premised his conclusions, the Court finds that (1) each of the

withholdings at issue was generated during the agency's investigation of Matthews and thus

constitutes a law enforcement record, and (2) the FBI has logically connected each of its

withholdings to a reasonable expectation of risk that the law might be circumvented if the

information were disclosed. Accordingly, the Court holds that the FBI properly invoked

Exemption 7(E) to withhold the above materials related to its techniques and procedures for law

enforcement investigations.

3. *Segregability*

The Court must also consider *sua sponte* whether the FBI has produced all segregable,

non-exempt information. *See Morley*, 508 F.3d at 1123 ("[T]he District Court ha[s] an

affirmative duty to consider the segregability issue *sua sponte*." (quoting *Trans-Pac. Policing

Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999))); *see also Stolt-Nielsen

Transp. Group Ltd. v. United States*, 534 F.3d 728, 733–35 (D.C. Cir. 2008) ("[B]efore

approving the application of a FOIA exemption, the district court must make specific findings of

segregability regarding the documents to be withheld." (citation omitted)). To establish that all

reasonably segregable, non-exempt information has been disclosed, the FBI bears the burden of

demonstrating "with 'reasonable specificity'" that the information it withheld cannot be further

segregated. *Armstrong v. Exec. Office of the President*, 97 F.3d 575, 578 (D.C. Cir. 1996).

Here, the FBI attests that it performed a segregability review, Dkt. 53-6 at 42–43 (Argall Decl. ¶ 74), and it has produced a *Vaughn* Index identifying its withholdings, *see* Dkt. 24-2. Argall testifies that, following the review, "RIDS determined that 35 pages could be released in full without redaction as there was no foreseeable harm to an interest protected by a FOIA exemption." Dkt. 53-6 at 42 (Argall Decl. ¶ 74). RIDS also determined that "272 pages could be released in part with redactions per the identified FOIA exemptions . . . ." *Id.* Those pages contained "a mixture of material that could be segregated for release and material that was withheld as release would trigger foreseeable harm to one or more interests protected by the cited FOIA exemption." *Id.* at 41–42 (Argall Decl. ¶ 74). Finally, "RIDS determined that 364 pages were required to be withheld in their entirety." *Id.* at 42 (Argall Decl. ¶ 74). To justify the decision, Argall explains:

> RIDS determined that all information on these pages was either fully covered by one or more of the cited FOIA exemptions, or determined that any non-exempt information on these pages was so intertwined with exempt material, that no information could be reasonably segregated for release. Any further segregation of this intertwined material would employ finite resources only to produce disjointed words, phrases, or sentences, that taken separately or together, would have minimal or no informational content.

*Id.*

Matthews does not challenge the FBI's segregability analysis, and the Court has no reason to doubt the agency's good-faith representations. Accordingly, the Court is satisfied that the agency has produced all segregable, non-exempt records with respect to the 671 pages that it has processed.

## B.     FOIA Waiver

There is one additional wrinkle: The FBI concedes that its search also located "several other files" that "were not processed under [FOIA], based on [Matthews's] waiver of his [FOIA]

rights." Dkt. 53-6 at 9–10 (Argall Decl. ¶ 18). Specifically, the FBI declined to process "those investigative files resulting in [Matthews's] wire fraud and bank fraud prosecutions—Case No. 1:11-cr-87 (E.D. Va.) [original E.D. Va. charge], Case No. 1:11-cr-348 (E.D. Va.) [consolidated E.D. Va. Case], Case No. 8:10-cr-00706 (D. Md.) [original Maryland charge], and the related motion to vacate [his] sentence, Case No. 1:12-cv-132 (E.D. Va.)."[5] *Id.* at 10–11 (Argall Decl. ¶ 20). "[A] categorical refusal to release documents that are in the agency's 'custody' or 'control' for any reason other than those set forth in the Act's enumerated exceptions [constitutes] 'withholding.'" *Morley*, 508 F.3d at 1119 (quoting *McGehee v. CIA*, 697 F.2d 1095, 1110 (D.C. Cir. 1983)). The Court must, accordingly, determine whether the waiver in Matthews's plea agreement is a valid basis upon which to withhold these documents—that is, whether the waiver is enforceable.

The controlling case in this Circuit is *Price v. United States Dep't of Justice Attorney Office*, 865 F.3d 676 (D.C. Cir. 2017). There, the Court of Appeals held that the government could not "invoke [the defendant's] FOIA waiver as a basis for denying him access to the records . . . because, in [*that*] case, the government [gave] . . . no adequate rationale for enforcing this waiver in light of the public-policy harms [the defendant] identified." *Id.* at 683 (emphasis in original). The court reasoned that, "[a]t the end of the day, a plea agreement that attempts to waive a right conferred by a federal statute is, like any other contract, 'unenforceable if the interest in its enforcement is outweighed [under] the circumstances by a public policy harmed by enforcement.'" *Id.* (quoting *Town of Newton v. Rumery*, 480 U.S. 386, 392 (1987)). Relying on

---

[5] Argall's declaration identifies the following files: "Washington Field Office file 49A-WF-228225, and Baltimore Field Office file 329E-BA-109955, with additional cross-reference serials 29-BA-C92847 Sub X serials 31508 and 31323; 29-WF-C209790 Sub G serials 1663 and 1879; and 182B-WF-234447 serial 122." Dkt. 53-6 at 11 n.10 (Argall Decl.).

the Supreme Court's decision in *Rumery*, which held that a "prosecutor is permitted to consider only legitimate criminal justice concerns in striking [a plea] bargain," 480 U.S. at 401, the court held that a FOIA waiver is only enforceable if it furthers a legitimate criminal justice interest, *Price*, 865 F.3d at 683. Requiring this consideration "places boundaries on the rights that can be bargained away in plea negotiations," in light of the "uneven power dynamic [that] lurks in the background in cases like these." *Id.* at 681, 683. Although the U.S. Attorney's Office in *Price* failed to articulate "any legitimate criminal justice interest served," *id.* at 681, the D.C. Circuit recognized that a FOIA waiver might be enforceable under different circumstances, *id.* at 683 ("To be clear, we do *not* hold that FOIA waivers in plea agreements are always unenforceable.").

The FBI argues that, unlike in *Price*, there are three criminal justice interests that justify the enforcement of Matthews's FOIA waiver: (1) "the finality of [the plea] agreement in which [Matthews] voluntar[ily] acknowledged that his 'attorney [had] rendered effective service,'" Dkt. 62 at 3; (2) the need to prevent a backlog of FOIA litigation in federal courts, Dkt. 53-1 at 7; and (3) the interest in preventing a drain on the FBI's resources through onerous or duplicative production, *id.* None is availing.

The FBI's first asserted interest—finality—was expressly rejected by the *Price* Court. The *Price* decision states:

> FOIA waivers promote finality only by making it more difficult for criminal defendants to uncover exculpatory information or material showing that their counsel provided ineffective assistance. That argument takes the finality interest too far. After all, a defendant can never waive [its] right to bring a colorable claim of ineffective assistance of counsel, even though such claims undermine finality.

*Price*, 865 F.3d at 682 (citations omitted). Indeed, the FBI's argument that Matthews should be held to the representation in the plea agreement that his attorney had rendered effective service in representing him not only runs counter to *Price*, but it also contravenes the D.C. Circuit's

decision in *United States v. Guillen*, 561 F.3d 527 (D.C. Cir. 2009), which holds that a plea agreement cannot preclude an appeal based on ineffective assistance of counsel. *Id.* at 530 ("[A] waiver should not be enforced insofar as the defendant makes a colorable claim he received ineffective assistance of counsel in agreeing to the waiver." (citations omitted)).

The FBI's second asserted interest fares no better. The agency contends that enforcing Matthews's waiver will prevent the "expense of time that will [otherwise] be borne by this Court" if he is permitted to seek records related to his prosecution. Dkt. 53-1 at 7. That does not constitute a criminal justice interest. As a threshold matter, it is unclear whether enforcing Matthews's waiver would in fact save the Court time or resources. As evidenced by this opinion, the Court must adjudicate Matthews's FOIA suit, regardless of whether the waiver is enforced, and resolving the FOIA waiver issue itself requires judicial resources. But, even assuming that doing so would conserve *judicial resources*, that does not explain how enforcing Matthews's waiver advances a *criminal justice interest*. *See Price*, 865 F.3d at 682 (citing "efficient and effective prosecution" as an example of a legitimate criminal justice interest). The FBI's rationale, moreover, runs counter to Congress's intent that courts serve as the "appropriate forum for protecting the public's rights to information through judicial review of denials of requests to release materials." *FDIC v. Ernst & Ernst*, 677 F.2d 230, 232 (2d Cir. 1982) (citing *GTE Sylvania, Inc. v. Consumers Union of the U.S., Inc*., 445 U.S. 375, 387 (1980)).

Finally, the FBI alleges that Matthews's FOIA waiver prevents the government from having to "drain enormous amounts of . . . resources" on FOIA litigation and produce allegedly duplicative documents that Matthews may have "already received . . . in substance" pursuant to the agreed discovery order in his prosecution. *See* Dkt. 53-1 at 5–7. Although the "allocation of criminal justice resources" *may* constitute a legitimate criminal justice interest for waiving a

defendant's FOIA rights, *see Price*, 865 F.3d at 681, the mere fact that Matthews, at one point, had access to some of the documents related to his prosecution is not a sufficient basis for the agency to categorically withhold all such documents in a later FOIA litigation. That is especially so because the FBI has offered no evidence to substantiate its claim that processing Matthews's request would be so onerous on "the FBI and two United States Attorneys' Offices" as to affect their allocation of criminal justice resources. Dkt. 53-1 at 7; *see also* Dkt. 53-2 at 1–2 (SUMF ¶¶ 3–10). The FBI's declarations do not, for instance, estimate how many pages of records would need to be processed or the time needed to process them. Absent that basic information, the Court cannot conclude that Matthews's request would unnecessarily drain criminal justice resources. Indeed, the available evidence seems to suggest the opposite. Argall attests that the FBI has already located the records, Dkt. 53-6 at 10 (Argall Decl. ¶ 18), so the only additional step would be to process them. Nothing in the record suggests that resources from the criminal division of the FBI or the U.S. Attorney's Office would be required to do so. Rather, RIDS—the records division of the FBI—is in charge of responding to Matthews's FOIA request, and the Civil Division of the U.S. Attorney's Office is litigating this case. Accordingly, the government has failed to establish—on the present record—any legitimate criminal justice interest served by Matthews's FOIA waiver.

On the other hand, *Price* underscores that there is a strong countervailing interest in allowing those convicted of crimes to avail themselves of FOIA. *See* 865 F.3d at 682. The court noted, in particular:

> FOIA plays a significant role in uncovering undisclosed *Brady* material and evidence of ineffective assistance of counsel, and in practice has led to uncovering records relevant to ineffective-assistance-of-counsel claims, such as plea offers not communicated by defense counsel to clients. . . . FOIA thus

provides an important vehicle for vindicating significant rights . . . .  Indeed, in some cases it is the *only* vehicle.

*Id.* (internal citations omitted) (emphasis in original).  That is precisely the purpose for which Matthews alleges that he filed his FOIA request: to demonstrate that his counsel was ineffective for failing to communicate an early plea agreement.  *See* Dkt. 59 at 1.  The government has not addressed—or even acknowledged—this countervailing interest.

In sum, because the FBI has failed to substantiate—on the particular facts of this case—that the enforcement of Matthews's FOIA waiver would further a legitimate criminal justice interest that outweighs Matthews's interest in accessing records related to his prosecution, the Court concludes that the agency is not entitled to withhold those documents on the basis of Mathews's FOIA waiver.  The Court will, accordingly, deny summary judgment as to that defense.

## CONCLUSION

For the foregoing reasons, the FBI's motion is **GRANTED** in part and **DENIED** in part. The motion is **DENIED** with respect to the FBI's waiver defense.  Moreover, because the Court requires additional information to assess portions of the FBI's withholdings pursuant to FOIA Exemptions 6 and 7(D), the motion is **DENIED** with respect to those withholdings.  In all other respects, however, the motion is **GRANTED.**

It is further **ORDERED** that the FBI shall process and produce the non-exempt records related to Matthews's prosecution as soon as practicable.

It is further **ORDERED** that the FBI shall file a status report with the Court on or before May 1, 2019, regarding the status of its productions.

**SO ORDERED.**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: March 31, 2019